**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RMB FASTENERS, LTD., a Hong Kong limited liability company, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 11 CV 02071 |
| vs. | ) ) | Honorable Judge |
| HEADS & THREADS INTERNATIONAL, LLC, a Delaware limited liability company, CAPITAL PARTNERS, INC., a Connecticut corporation, JPMORGAN CHASE BANK, N.A., a national banking association, PATRICK D. CAVANAUGH, as assignee for the benefit of the creditors of Heads & Threads International, LLC, and MICHAEL WRENN, an individual. | ) ) ) ) ) ) ) ) ) ) ) | Rebecca Pallmeyer |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff RMB Fasteners, LTD ("RMB" or "Plaintiff") manufactures screws, bolts, washers, nuts, and other fastening devices. RMB exported its products to companies throughout the world, including to Defendant Heads & Threads International, LLC ("HTI"), a global importer and distributor of industrial and construction fasteners. In March 2011, the economic downturn took its toll on HTI. Facing insolvency, HTI completed a trust agreement on March 25, 2011, assigning all of its assets to Defendant Patrick D. Cavanaugh as assignee for the benefit of HTI's creditors.

Pursuant to the Uniform Commercial Code ("UCC"), RMB seeks to reclaim not only goods that it shipped within ten days of its reclamation demand, but all goods for which HTI has not paid–recovery RMB claims it is entitled to under UCC § 2-207 because of alleged false assurances of HTI's solvency. RMB also alleges that HTI ordered and accepted those goods without the intention to pay, but instead with the intention to liquidate the goods in a fire sale for the benefit of

its primary creditor, Defendant JP Morgan Chase Bank ("Chase"), whose loan is secured by a floating lien on HTI's inventory.

Plaintiff brings claims of reclamation, fraud, conspiracy, conversion, and unjust enrichment against Defendants HTI; Chase; Capital Partners, alleged to be HTI's primary investor; Michael Wrenn, HTI's President and CEO; and Cavanaugh, not in his individual capacity, but solely as assignee for the benefit of HTI's creditors. Additionally, RMB alleges that Defendants HTI and Wrenn breached the special-circumstance fiduciary duty owed by insolvent companies to their creditors. Finally, RMB brings claims for breach of contract and account stated against Defendants HTI and Cavanaugh. Defendants have moved to dismiss all claims other than breach of contract and account stated. For the reasons articulated below, Defendants' motions to dismiss are granted in part and denied in part.

## FACTUAL BACKGROUND

Plaintiff RMB is a Hong Kong limited liability company that, since 2006, has been in the business of manufacturing and exporting fasteners and fastener-related items, such as screws, bolts, washers, and nuts, to companies throughout the world. (First Am. Verified Compl. for Injunctive and Other Relief (hereinafter "First Am. Compl."), ¶¶ 2, 11.) None of RMB's members are United States residents or corporations. (Hr'g Tr., Mar. 29, 2011, at 6.) Defendant HTI is a Delaware limited liability company with its principal place of business in Carol Stream, Illinois. (*Id.* ¶ 3.) HTI is in the business of importing and distributing industrial and construction fasteners and related products, including RMB products. (*Id.* ¶ 12.) There is no indication that HTI has any foreign members. (Hr'g Tr., Mar. 29, 2011, at 3.) Defendant Michael Wrenn, a resident of Downers Grove, Illinois, is HTI's President and CEO. (*Id.* ¶ 7.) Defendant Capital Partners is a Connecticut corporation and private equity investment firm that Plaintiff alleges is one of HTI's primary investors. (*Id.* ¶¶ 4, 16-17.) Defendant Chase is a national banking association, chartered under the laws of the United States. (*Id.* ¶ 5.) Chase provided financing to HTI secured, at least in part, by a floating

blanket lien on HTI's inventory. (*Id.* ¶ 20; Pledge and Security Agreement, December 20, 2007, Ex. B to Kuhn Decl., Ex. 1 to Chase's Mem. of Law in Opp. to Pl.'s Emergency Mot. for TRO(hereinafter "Chase's Opp. to TRO"), at art. II.) Plaintiff alleges that Chase and Capital Partners have had "full or partial" control over HTI's operations since at least December 2010, including the decision to order RMB products and attempts to sell HTI in late 2010 and early 2011. (First Am. Compl. ¶¶ 18, 21-23.)

Since approximately September 2006, RMB and HTI have engaged in a trade relationship under which the two companies have entered into hundreds of sales contracts for HTI's purchase of RMB products, amounting to over $72 million worth of goods. (*Id.* ¶¶ 13, 15.) Despite the relatively long and, it appears, symbiotic history between the two companies, RMB was allegedly unaware of HTI's financial troubles. RMB's First Amended Complaint does not make clear when or how HTI's financial problems began, but Plaintiff does allege that from approximately June 2009 to February 2011, HTI entered into approximately eight forbearance agreements with Chase and HTI's other lenders. (*Id.* ¶ 22.)[1] Chase agreed not to call HTI's loans provided that HTI deliver frequent financial reports; that HTI attempt to either (a) find a buyer for substantially all of its assets or (b) secure refinancing with another lender; and that HTI retain a Chief Restructuring Officer, approved by Chase, to be "given final decision-making authority regarding the day-to-day operational, financial, and strategic management" of HTI. (Forbearance Agreement and Amendment No. 4 to Credit Agreement § 5.2-.4, Ex. M to First Am. Compl.) Also pursuant to the forbearance agreement, HTI retained Conway MacKenzie, a "turnaround" firm, to advise HTI regarding HTI's deteriorating financial situation in November 2010. (*Id.* § 5.1; First Am. Compl. ¶¶

---

[1]     Only two of these forbearance agreements appear in the record—the fourth forbearance agreement, dated January 11, 2011, and the fifth agreement, dated January 19, 2011. (Exs. M and N to First Am. Compl.) Both agreements reference an original Credit Agreement, dated December 20, 2007, which was appended to Chase's memorandum in opposition to Plaintiff's emergency TRO petition. (Credit Agreement, December 20, 2007, Ex. A to Kuhn Decl., Ex. 1 to Def. Chase's Opp. to TRO.)

24-25.). Upon reviewing HTI's sales forecasts in December 2010, Conway MacKenzie warned both HTI and Chase that HTI would not meet its sales projections for the first quarter of 2011. (First Am. Compl. ¶¶ 33-34.)

On December 9, 2010, HTI, through Wrenn, instructed RMB to hold new shipments. (E-mail Message from Wrenn and Ruth Dowling, Vice President Materials, HTI, to Barbara Chen (a/k/a Pak Hung Yeung), Vice President Sales, RMB, of 12/9/10, Ex. A. to First Am. Compl.) Wrenn explained that HTI had an "extraordinary container volume," and requested that RMB hold any new shipments so that HTI could "handle the heavy influx and work [its] way through the backlog." (*Id.*) Wrenn stated that HTI "expect[ed] demand in the U.S. to resume starting January 2 . . . and to have this situation completely resolved prior to the Chinese New Year." (*Id.*) Plaintiff has not alleged facts to suggest HTI lied about having a backlog of inventory caused by an influx of shipments during a period of low demand; Plaintiff nevertheless alleges, however, that the real reason for the shipment hold was that, unbeknownst to RMB at the time, HTI's financing agreement with Chase had expired, leaving HTI unable to pay for additional RMB shipments. (First Am. Compl. ¶¶ 38-39.) According to RMB, HTI, Wrenn, Capital Partners, and Chase were aware of HTI's insolvency in or before December 2010, and knew that HTI was unable to pay for new purchases of RMB products. (*Id.* ¶¶ 43-46.)

On December 21, 2010, Wrenn notified RMB that HTI would begin to approve new shipments delayed the week before and that beginning on December 27, HTI would "begin to approve new bookings, including primary Mill shipments and expedited items." (E-mail Message from Wrenn & Dowling to Chen of 12/21/10, Ex. B. to First Am. Compl.). Wrenn again attributed the previous delay to a "container backlog" and projected that demand would pick up in the new year. The next day, Ruth Dowling, HTI's Vice President of Materials, followed up with an e-mail message informing RMB that:

1.     This week we should be able to approve everything remaining that you

                attempted to book last week.

2.      We appreciate your offer to help us with payment. At the moment, I don't have any new instructions for you regarding payment. We may contact you at some time in the future.

3.      I believe we are waiting for some past due flange nuts and carriage bolts. Please make every effort to book past due flange nuts. We have urgent need for those items and will approve them immediately.

4.      Has RMB stopped production of HTI goods? We are working to provide a revised delivery due date for our open PO's. It will likely be after the first of the year before we have answers for you. That said, we do anticipate business picking up in Jan. I would hate to get caught in a position where we run out of product because RMB has not produced it. Any comment?

(E-mail Message from Dowling to Chen of 12/22/10, Ex. C. to First Am. Compl.)

Shortly after the beginning of the new year (2011), Wrenn followed up on RMB's apparent offer to help HTI with payment. In a letter dated January 3, 2011, Wrenn stated:

We are asking for your support and cooperation once again during the first quarter of 2011. We are moving to a new bank between now and the end of March 2011 and during that time we need to extend our payment terms by 30 days. We want to stress that this is a temporary situation and we will resume payments according to our normal terms in April.
. . . .
We expect 2011 to be a better year and we thank you, our partner, for your extraordinary assistance.

(Letter from Wrenn & Dowling to Chen of 1/3/11, Ex. D to First Am. Compl.)

On January 14, 2011, Wrenn sent a letter to all of HTI's vendors, including RMB, explaining HTI's financial situation. (Letter from Wrenn to Vendors of 1/14/11, Ex. F. to First Am. Compl.) Specifically, Wrenn's letter noted that HTI's inventory increased significantly during November and December because sales were weaker than in previous years, while at the same time HTI "released and subsequently received a tremendous amount of product from" its suppliers. (*Id.*) Wrenn also explained that due to the financial crisis, low sales levels, and "high cash outflows required to pay for product and shipping costs," HTI was "facing greater short-term borrowing restrictions at a time when it need[ed] just the opposite." (*Id.*) In particular, Wrenn observed that banks were reluctant to "lend against higher inventory levels because they fear inventory could lose value quickly should another economic crisis develop." (*Id.*) Wrenn thanked HTI's suppliers for their support and

cooperation in extending payment terms and offered an optimistic appraisal of HTI's financial situation going forward:

> Some positive news is that our January sales revenues thus far are more than 50% higher than the same period one year ago and we expect continued revenue growth in the weeks and months ahead. We have been working very closely with our banks and investors to provide the necessary capital to fund operating needs in 2011 and beyond. At this time, we are on track to finalize an arrangement to provide the required long term funding by the end of first quarter 2011 or sooner.

(*Id.*)

On January 25, 2011, RMB's Vice President of Sales, Barbara Chen (a/k/a Pak Hung Yeung) met face-to-face with Wrenn, Dowling, and Fred Weber (HTI's CFO) at HTI's offices in Carol Stream, Illinois. (First Am. Compl. ¶ 85.) Plaintiff alleges that, at this meeting, Wrenn informed Chen that, in the summer of 2010, Chase had requested that Capital Partners obtain additional investment or new ownership to fund HTI's operations. (*Id.* ¶ 88.) Wrenn allegedly disclosed that Capital Partners had informed HTI that a potential buyer had made an offer to purchase HTI. (*Id.* ¶ 86.) At this meeting, Chen requested that HTI amend the Bills of Lading on RMB's in-transit shipments to allow RMB to retrieve the shipments. (*Id.* ¶ 89.) According to RMB, Wrenn stated that HTI would have to seek Chase's approval for such a request. (*Id.* ¶ 90.)

The next day, January 26, 2011, Chen again met face-to-face with Wrenn and Dowling. At this meeting, Wrenn allegedly informed Chen that Chase had refused to allow HTI to change the Bills of Lading. (*Id.* ¶ 92.) RMB alleges that Wrenn also informed Chen that if the prospective buyer were to make a deposit by mid-February—an event Wrenn allegedly said was "highly possible"—HTI's cash flow problems would be solved. (*Id.* ¶ 93.) Additionally, RMB claims that Wrenn expressed confidence that the deal with the prospective buyer would close before February 12, 2011, and that in the event that the deal fell through, Capital Partners and HTI would secure refinancing with a new bank. (*Id.* ¶ 95.) Wrenn reportedly acknowledged that he was unsure "why Capital Partners was slow in addressing Chase's request that Capital Partners and HTI obtain

additional investment or new ownership to fund HTI's operations," but assured Chen that "Capital Partners was complying with Chase's request and that soon HTI and Capital Partners would 'settle everything.'" (*Id.* ¶¶ 99-100.) Wrenn further assured Chen that "the amount due on RMB's past due invoices to HTI was correct, that HTI would pay RMB for all past-due invoices, and that HTI would honor open orders as well." (*Id.* ¶ 97.)

Notably, it appears that RMB ceased new shipments to HTI before the time of these two meetings. January 18, 2011, was the last Bill of Lading date listed on RMB's inventory of unpaid goods. (Invoice Numbers, Ex. A to Reclamation Demand, Ex. I to First Am. Compl.) On January 27, 2011, the day after the last face-to-face meeting, RMB filed a UCC Financing Statement pertaining to the unpaid goods shipped to HTI, and notice of the Financing Statement and lien was delivered to Chase on January 28, 2011. (*Id.* ¶¶ 105-06.)

On February 10, 2011, Plaintiff alleges, RMB ceased production of new products for HTI. (*Id.* ¶ 108.) Plaintiff claims that up until that date, it had manufactured and held approximately $1,160,000 worth of goods to fill 617 outstanding HTI purchase orders, and that these finished goods either were not readily sellable to other purchasers because they were custom orders, or were regarded as overstock and would have to be sold at a deep discount. (*Id.* ¶¶ 109-12.) Plaintiff alleges that approximately $350,000 of the finished goods are completely unsellable to other customers and are likely to be sold as scrap metal. (*Id.* ¶ 113.)

On February 12, 2011, Chen placed multiple, unanswered telephone calls to Wrenn, seeking information regarding the purported deal for the sale of HTI and the satisfaction of all outstanding invoices. (*Id.* ¶¶ 115-16.) That same day, RMB sent a Reclamation Demand via mail to HTI pursuant to UCC § 2-207, 810 ILCS 5/2-207, demanding the return of all unpaid goods. (Reclamation Demand.) RMB calculated the value of the goods at $2,562,056.03. (*Id.*) Wrenn addressed the Reclamation Demand by e-mail on February 19, 2011, noting that HTI was working hard to provide "some satisfaction in the near future," and that HTI had taken steps to protect

RMB's reclamation rights by setting aside the remaining goods while HTI's attorneys and Chief Restructuring Officer evaluated the claim.  (E-mail Message from Wrenn to Chen of 2/19/11, Ex. J. to First Am. Compl.)  On March 4, 2011, HTI informed RMB that HTI had set aside approximately $380,000 worth of RMB products shipped within ten days of RMB's Reclamation Demand, pursuant to UCC § 2-207. but the remaining RMB Products had already been liquidated.  (First Am. Compl. ¶¶ 124. 127.)[2]  Plaintiff alleges that approximately $420,000 were "ten-day" goods properly subject to the Reclamation Demand.  (*Id.* ¶ 126.)

On March 15, 2011, HTI entered into a Trust Agreement and Assignment for the Benefit of Creditors ("ABC").  (First Am. Compl. ¶ 138.)  Pursuant to the ABC, HTI transferred all its assets to Defendant Cavanaugh, who was appointed as trustee-assignee charged with the "orderly liquidation of the assets and property of HTI, and the distribution of the proceeds there from to creditors of HTI in accordance with applicable law."  (ABC ¶ 2-3, Ex. A to Pl.'s Supp. Brief in Supp. of its Mot. to Disqualify Counsel for Defs.' HTI and Cavanaugh.)

On March 25, 2011, RMB filed this lawsuit.  Plaintiff's original complaint listed five counts against all Defendants: (I) Reclamation, (II) Scheme to Defraud, (III) Civil Conspiracy, (IV) Conversion, and (V) Unjust Enrichment.  Plaintiff alleges that it is entitled under the UCC, 810 ILCS 5/2-207, to reclaim not only goods shipped to the insolvent HTI within ten days of RMB's Reclamation Demand, but to return of all of the goods for which HTI has not paid because, Plaintiff alleges, HTI made written misrepresentations of its solvency.  Plaintiff also alleges that HTI defrauded RMB through false and misleading statements intended to induce RMB to continue shipping products to HTI.  Plaintiff alleges that these fraudulent misrepresentations were part of a conspiracy among Defendants to procure additional RMB products without the intention of paying RMB, but rather with the intention of quickly liquidating the additional inventory for the benefit of

---

[2]      It is not clear from the record or from Plaintiff's complaint how HTI communicated this message to RMB.

HTI's secured creditor, Chase. In an amended complaint, filed June 20, 2011, Plaintiff added three additional counts: (VI) Breach of Contract, (VII) Account Stated, and (VIII) Breach of Fiduciary Duty. Counts VI and VII name HTI and Cavanaugh as Defendants, while Count VII names HTI, Wrenn, and Cavanaugh. According to this last count, HTI and Wrenn breached the special-circumstance fiduciary duty owed to creditors of an insolvent corporation.

## PROCEDURAL BACKGROUND

Together with its initial complaint, Plaintiff filed a motion for a temporary restraining order ("TRO") enjoining any further liquidation of RMB products pursuant to the ABC. In an April 7, 2011 hearing on the motion, the court heard Timothy Turek, a managing director of Conway MacKenzie; neither Plaintiff nor Defendant Chase presented evidence at the TRO hearing. After a review of Plaintiff's complaint and the evidence presented, the court concluded that Plaintiff was not likely to succeed on the merits of its fraud claim, or reclamation claim for goods other than ten-day goods, because there was no evidence that HTI had been untruthful in its representations about its financial situation. (TRO Hr'g Tr., Apr. 7, 2011, at 78.) Accordingly, the court limited its TRO to direct HTI "to seek court approval before sale of the 'ten day' merchandise at any price below the price at which HTI contracted to purchase the merchandise from Plaintiff." (Minute Order [23].)

Subsequently, the parties submitted an Agreed Order, which the court entered on May 11, 2011. (Agreed Order [40].) Pursuant to that order, Plaintiff agreed to terminate and release the UCC Financing Statement it filed against HTI on January 27, 2011. In exchange, the parties agreed that Cavanaugh would make available to RMB the goods, valued at $377,368, that HTI had set aside as ten-day goods and which the parties agreed were properly subject to RMB's Reclamation Demand. Additionally, the parties agreed that Cavanaugh would set aside $1,031,521.01 in escrow from the auction of substantially all the remaining assets previously held

by HTI scheduled for May 12, 2011, and set to close on May 17.[3]

## DISCUSSION

### I.    Legal Standard

In order to survive a 12(b)(6) motion, a plaintiff's complaint must contain a "short and plain statement of the claim," FED. R. CIV. P. 8(a)(2), and must contain sufficient factual matter that when accepted as true, states a claim upon which relief can be granted that is "'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint that alleges fraud must, in addition, satisfy the heightened pleading requirements of Federal Rule of Procedure 9(b), discussed in more detail below. When, as in this case, a plaintiff attaches documents to its complaint, those documents become part of the complaint itself and "may permit the court to determine that the plaintiff is not entitled to judgment." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010). Put another way, a plaintiff "can plead himself out of court by pleading facts that show that he has no legal claim." *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). Furthermore, the Seventh Circuit "has long held that, when a document contradicts a complaint to which it is attached, the document's facts or allegations trump those in the complaint." *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 (7th Cir. 2004).

### II.    Defendant Cavanaugh as a Necessary Party

As a preliminary matter, Defendant Cavanaugh argues that all claims against him, as assignee for the benefit of creditors, are improper because the events forming the basis of this lawsuit occurred before the assignment and Plaintiff has not alleged that Defendant Cavanaugh has committed any individual wrongdoing. The court concludes that Cavanaugh is nevertheless a

---

[3]    The parties have not explained their calculation of this figure, but the court assumes that this dollar amount is the difference between the value of the RMB goods HTI had on its shelves at the time of the TRO hearing, approximately $1.4 million (TRO Hr'g Tr., Apr. 7, 2011, at 11), and the value of the goods returned to HTI pursuant to the Agreed Order.

necessary party properly joined pursuant to Federal Rule of Civil Procedure 19. Under the assignment, Cavanaugh holds title to the trust *res*, including the goods that are at issue in Plaintiff's reclamation claim. Should this court conclude that Plaintiff is entitled to reclaim certain goods, relief may be unavailable if Cavanaugh himself is not subject to this court's order. As such, Cavanaugh is a required party without whom "the court cannot accord complete relief among existing parties." FED. R. CIV. P. 19(a)(1)(A).

## III.    Reclamation (Count I)

The Uniform Commercial Code provides for reclamation as a remedy to sellers who discover a buyer's insolvency:

> Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within 10 days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within 3 months before delivery the 10 day limitation does not apply.

810 ILCS 5/2-702. Plaintiff's claim seeks the return of all "ten-day" goods—a matter that Plaintiff contends was not fully resolved by the May 11, 2011 Agreed Order—as well as the return of approximately $2.5 million worth of other unpaid goods, a remedy Plaintiff claims it is entitled to because of HTI's alleged misrepresentations of solvency. The court discusses these claims, in turn, below.

As a preliminary matter, however, the court concludes that Defendants Capital Partners, Chase, and Wrenn are not properly named as Defendants under this count. Reclamation is a statutory claim brought by a seller of goods against an insolvent buyer for the return of the goods. As such, Plaintiff's claim is truly against HTI, who ordered and received the goods, and Cavanaugh, to whom HTI assigned the goods for the benefit of its creditors. The other Defendants are not "buyers" within the meaning of the Uniform Commercial Code. *See* 810 ILCS 5/2-103 (defining "Buyer" as "a person who buys or contracts to buy goods"). Furthermore, there is no evidence that these Defendants are in possession of the goods at issue. Therefore, the court dismisses Count I

11

against Defendants Capital Partners, Chase, and Wrenn.

## A. Ten-Day Goods

Plaintiff contends, first, that Defendants HTI and Cavanaugh have not returned the true and correct amount of goods Plaintiff delivered to HTI within ten days of its Reclamation Demand. Pursuant to the Agreed Order of May 11, 2011, in exchange for Plaintiff's termination and release of the Financing Statement it filed for the goods, Cavanaugh agreed to return $377,368.00 worth of goods that the parties agreed were properly reclaimed by Plaintiff. (Agreed Order ¶ 3.) These goods correspond with the goods HTI informed RMB it would set aside as ten-day goods on March 4, 2010. (First Am. Compl. ¶ 124.) Plaintiff, however, alleges that at least $419,564.99 worth of goods were ten-day goods, an approximately $40,000 difference. (*Id.* ¶ 125.)

Neither HTI nor Cavanaugh challenge Plaintiff's right to the ten-day goods in their motions to dismiss. Notably, it is Defendant Chase who challenges Plaintiff's right to reclaim *any* ten-day goods, arguing that Plaintiff's right to reclaim is subject to Chase's own floating lien on HTI's inventory. Chase contends that, as an Article 9 secured creditor, Chase is a "good faith purchaser" within the meaning of UCC § 2-702(3), which subjects a seller's reclamation right to "the rights of a buyer in ordinary course or other good faith purchaser." 810 ILCS 5/2-702(3). This court, however, need not decide the issue. The court concludes, first, that Defendant Chase waived its rights to challenge Plaintiff's reclamation claims for the goods already returned to Plaintiff pursuant to the May 11, 2011 Agreed Order. Counsel for Chase was present at the hearing at which that Order was considered and all parties agreed to its entry. (Agreed Order at 1.) In that Order, the parties agreed that the goods set aside by HTI were properly reclaimed by RMB. (Agreed Order ¶ 3.) Furthermore, because the court has dismissed Chase from Count I based on its primary argument—that it is not a "buyer" within the meaning of § 2-702 (and is, at any rate, not in possession of the goods)—the court need not decide Chase's argument, made in the alternative,

that its security interest prevents Plaintiff from reclaiming any of the ten-day goods from HTI.[4]

Accordingly, Plaintiff's claim survives as to the ten-day goods.

## B.    Misrepresentation of Solvency

Plaintiff claims that its right to reclamation is not limited to those goods delivered ten days before its Reclamation Demand, but that Plaintiff is entitled to reclaim all the unpaid goods because of alleged misrepresentations of solvency.  The UCC allows sellers to reclaim unpaid goods other than ten-day goods if a seller can demonstrate that the insolvent buyer misrepresented its solvency in writing within thirty days of the delivery of those goods.  810 ILCS 5/2-702(2).  The UCC defines "insolvent" as "(A) having generally ceased to pay debts in the ordinary course of business other than as a result of bona fide dispute; (B) being unable to pay debts as they become due; or (C) being insolvent within the meaning of federal bankruptcy law."  810 ILCS 5/1-201(b)(23).  The Bankruptcy Code, in turn, defines "insolvent" with reference to a corporation like HTI as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."  11 U.S.C. § 101(32).

Putting aside the fact that HTI appears to have already liquidated the goods in question (First Am. Compl. ¶ 127), the court concludes from a review of documents Plaintiff attached to its complaint that, even in the light most favorable to the Plaintiff, no reasonable trier of fact could find that HTI's communications with RMB constituted misrepresentations of solvency.  Plaintiff's factual

---

[4]    Chase's interpretation of UCC § 2-702(3), however, appears belied by the legislative history of that provision.  After the Illinois General Assembly adopted § 2-702(c)(3) as it appeared in the official text of the UCC at the time—which subjected a seller's reclamation rights to the "rights of a buyer in ordinary course or other good faith purchaser *or lien creditor*," UCC § 2-702(3) (1958 Official Text) (emphasis added)—the General Assembly amended the UCC in 1961 to delete the words "or lien creditor." This UCC provision has not been amended since, and the court is skeptical of Chase's argument that an amendment Congress made to the Bankruptcy Code in 2005—which explicitly subjected a seller's reclamation right to the rights of secured creditors, *see* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 1227(a), 119 Stat. 23, 199-200 (codified at 11 U.S.C. § 546(c)(1))—can provide guidance for interpreting a UCC provision adopted by the Illinois General Assembly in 1961.

allegations include both written representations (First Am. Compl. ¶¶ 36, 65, 80), and oral representations, allegedly made at the face-to-face meetings on January 25 and 26, 2011. (*Id.* ¶¶ 86, 93, 95, 97, 100.) For purposes of Plaintiff's reclamation claim, the court examines only the written representations.

Plaintiff claims, first, that HTI misrepresented the reason behind its request for RMB to hold any new shipments. Even if Plaintiff could prove that HTI lied when it attributed the need for the hold to an influx of shipments during a period of low demand, the request is not a representation about HTI's solvency. If anything, the request served to put Plaintiff on notice that HTI was experiencing difficulty ridding itself of excess inventory.

Next, Plaintiff points to the January 3, 2011 letter, in which Wrenn requested an extension of payment terms. Far from a misrepresentation of solvency, this letter arguably disclosed the opposite: that HTI was insolvent in the sense that it could not pay its suppliers as the bills came due, and that HTI was requesting assistance. Wrenn's optimistic projections—that 2011 would a better year and that HTI would resume regular payments in April—were not misrepresentations of HTI's then current financial circumstances. Furthermore, Wrenn's explanation that HTI was "moving to a new bank between now and the end of March 2011" is supported by the forbearance agreements between Chase and HTI, which Plaintiff attached to its complaint. Pursuant to those agreements, Chase agreed not to call HTI's loans provided that HTI took steps to sell the company or refinance its debt with another financial institution.

Finally, Plaintiff claims that Wrenn misrepresented HTI's solvency in his letter to vendors on January 14, 2011. But again, this letter notified Plaintiff of HTI's tenuous cash situation, attributing HTI's "short-term cash flow problem" to the financial crisis, low sales in November and December 2010, and the unwillingness of banks to provide short-term loans secured by HTI's inventory. Plaintiff cites no support to make plausible its allegation that Wrenn's assurances that HTI was working with its lenders and investors to provide long term funding solutions were false.

14

Nor can such assurances fairly be characterized as positive statements concerning HTI's finances.

Because Plaintiff cannot demonstrate misrepresentations of solvency, the court dismisses Count I against HTI and Cavanaugh to the extent that Plaintiff seeks reclamation of goods besides the ten-day goods.

## IV.    Averments of Fraud

### A.    Pleading Standard

Where a complaint sounds in fraud, the allegations of fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Specifically, "a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge and other conditions of a person's mind my be alleged generally." FED. R. CIV. P. 9(b). Generally, pleading fraud with particularity requires a plaintiff to "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)). Where, as here, there are multiple defendants in a case, "'the complaint should inform each defendant of the nature of his alleged participation in the fraud,' to the extent that such information is not uniquely within defendants' possession." *Gandhi v. Sitara Capital Mgmt., LLC*, 689 F. Supp. 2d 1004, 1008 (N.D. Ill. 2010) (quoting *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777-78 & n.5 (7th Cir. 1994)).

The Seventh Circuit has observed that "a plaintiff generally cannot satisfy the particularity requirement of Rule 9(b) with a complaint that is filed on information and belief." *Pirelli*, 631 F.3d at 442 (citing *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)). Where, however, "the facts constituting the fraud are not accessible to the plaintiff," a plaintiff may plead facts based on information and belief if the plaintiff provides "the grounds for his suspicions." *Id.* at 443; *see also Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992); *Bankers*

15

*Trust*, 959 F.2d at 684.  Put another way, to survive a motion to dismiss, a plaintiff pleading facts on information and belief must provide "some firsthand information to provide grounds to corroborate its suspicion." *Pirelli*, 631 F.3d at 446.  Although this more flexible approach to fraud pleading acknowledges "information asymmetries that may prevent a plaintiff from offering more detail," the Seventh Circuit was careful to note that "flexibility in the face of information asymmetries should not be conflated with whistling past the rules of civil procedure." *Id.* at 443, 446. Accordingly, "not just any grounds will do.  The grounds for the plaintiff's suspicions must make the allegations *plausible* . . . ." *Id.* at 443.

The court is satisfied that this more flexible standard for assessing fraud claims applies here.  Many of the factual allegations at the heart of Plaintiff's complaint are based on information and belief, including the timing and nature of HTI's insolvency and HTI's relationship and dealings with Capital Partners and Chase.  (*See, e.g.*, First Am. Compl. ¶¶ 12, 18, 21.)  Because facts relating to Plaintiff's allegations are within the exclusive control of Defendants, Plaintiff may proceed if it has firsthand information that makes such allegations plausible.

This pleading standard applies not only to Count II (Scheme to Defraud), but also to Counts III (Civil Conspiracy) and V (Unjust Enrichment).  Rule 9(b)'s heightened pleading standard "applies to 'averments of fraud,' not claims of fraud, so whether the rule applies will depend on the plaintiffs' factual allegations." *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).  Here, Plaintiff alleges a conspiracy between Defendants to engage in a scheme to defraud Plaintiff, allegations that trigger Rule 9(b)'s pleading standard.  *See id.* at 507 (concluding that Rule 9(b) applied to factual allegations of a conspiracy to commit fraud).  Similarly, the Seventh Circuit has concluded that unjust enrichment claims are subject to Rule 9(b) where a plaintiff alleges fraud as the underlying unlawful or improper conduct.  *See Pirelli*, 631 F.3d at 447.  Here, Count V is predicated on the alleged fraud.

### B.      Scheme to Defraud (Count II)

16

Under Illinois common law, "[g]enerally speaking, a claim for fraud must include the following elements: '(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.'" *Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (quoting *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (1996)). To establish the first element, a plaintiff must demonstrate a misrepresentation of fact; "[a] 'statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities, rather than to pre-existent or present facts, ordinarily does not constitute an actionable misrepresentation' under Illinois law." *Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1298 (7th Cir. 1993) (quoting *Peterson Indus., Inc. v. Lake View Trust & Sav. Bank*, 584 F.2d 166, 169 (7th Cir. 1978)).[5]

To the extent that the fraud claims are based on the written representations discussed above, those representations are insufficient to prove a claim of fraud for the same reason that they were insufficient to establish Plaintiff's reclamation claim. Although fraud also encompasses oral misrepresentations, the alleged misrepresentations made at the face-to-face meetings are similarly insufficient to satisfy Rule 9(b)'s heightened pleading standard.[6] According to Plaintiff, at the

---

[5] Under an exception to this rule, "[a] statement that, standing alone, appears to be a statement of opinion, nevertheless may be a statement of fact when considered in context." *West v. W. Cas. & Sur. Co.*, 846 F.2d 387, 393 (7th Cir. 1988). "Factors to be considered in determining whether a plaintiff reasonably relied on an opinion as though it were a statement of fact include 'the access of the parties to outside information,' the parties' relative sophistication, and whether 'the speaker has held himself out as having special knowledge.'" *Costello v. Grundon*, 651 F.3d 614, 639 (7th Cir. 2011) (quoting *West*, 846 F.2d at 393-94). RMB does not invoke this exception. Applying these factors to the facts in this case, the court concludes that RMB, a sophisticated corporate entity, could not reasonably rely on any opinions expressing optimism that HTI's financial situation would improve.

[6] Additionally, the face-to-face meetings appear to have occurred after Plaintiff ceased shipping goods to HTI. The meetings took place on January 25 and 26, 2011, approximately one
(continued...)

January 2011 meeting, Wrenn told Barbara Chen of RMB that Defendant Capital Partners had told Wrenn it had received an offer to purchase HTI. Wrenn also allegedly stated that in the event the purchase fell through, HTI was "in the process of working with a new bank to provide HTI with financing instead of Chase." (First Am. Compl. ¶ 95.) Plaintiff, however, offers no basis for suspicion that Wrenn's factual statements were false. Plaintiff also points to Wrenn's statements that he was very confident that the deal with the buyer would close and that it was "highly possible" that the potential buyer would submit a deposit that would solve HTI's cash flow problems. (First Am. Compl. ¶¶ 93, 95.) But these representations were opinions about the probability of future contingent events, not representations of fact, and therefore cannot serve as the basis for Plaintiff's fraud claim.

Plaintiff's fraud allegations are not limited to misrepresentations about HTI's financial situation. At a more fundamental level, Plaintiff alleges that Defendants committed fraud when HTI, under the alleged direction of Defendants Chase and Capital Partners, ordered and accepted delivery of goods without any intention to pay for those goods. Specifically, Plaintiff claims that HTI committed fraud by releasing the hold on new shipments and requesting that Plaintiff expedite orders of certain goods with the intention to liquidate those goods for the benefit of its primary creditor, Chase.

Generally, Illinois law does not recognize an action for promissory fraud, "but there is an exception to this rule 'where the false promise or representation of intention of future conduct is the scheme or device to accomplish fraud.'" *Bower v. Jones*, 978 F.2d 1004, 1011 (7th Cir. 1992) (quoting *Steinberg v. Chicago Med. Sch.*, 69 Ill. 2d 320, 334, 371 N.E.2d 632, 641 (1977)).

---

[6](...continued)
week after January 18, the last Bill of Lading date for the invoices Plaintiff listed in its Reclamation Demand. That timing demonstrates that Plaintiff could not have relied on any of the representations at the time it decided to ship HTI goods. The oral representations remain relevant to Plaintiff's fraud claim, however, because Plaintiff alleges that it continued to manufacture goods for HTI until February 10, 2011.

Because promissory fraud "is easy to allege and difficult to prove or disprove . . . the burden on a plaintiff claiming promissory fraud is deliberately high." *Id.* at 1012. As the Seventh Circuit has explained:

> In order to survive the pleading stage, a claimant must be able to point to specific, objective manifestations of fraudulent intent—a scheme or device. If he cannot, it is in effect presumed that he cannot prove facts at trial entitling him to relief. If the rule were otherwise, anyone with a breach of contract claim could open the door to tort damages by alleging that the promises broken were never intended to be performed. Presumably, it is this result that the Illinois rule seeks to avoid.

*Id.* (quoting *Hollymatic Corp. v. Holly Sys., Inc.*, 620 F. Supp. 1366, 1369 (N.D. Ill. 1985)).

The facts Plaintiff pleads in its complaint fall far short of "objective manifestations of fraudulent intent." The only firsthand information Plaintiff offers to support its suspicion that HTI never intended to pay for the goods are the forbearance agreements between Chase and HTI, as well as HTI's decision to hire Conway MacKenzie, a "turnaround" consultant, in November 2010. Plaintiff suggests that the forbearance agreements and retention of Conway MacKenzie demonstrates that HTI had decided to liquidate before it canceled the hold on new shipments and requested that Plaintiff expedite delayed shipments, but nevertheless proceeded with those shipments in an effort to increase the amount of inventory available for liquidation. RMB is correct that HTI's entry into a forbearance agreement with its primary creditor and its decision to hire a "workout" consultant demonstrate that HTI was in a dire financial situation and was considering liquidation as an option. It does not appear that liquidation was inevitable at that time, however. Indeed, Plaintiff's own complaint speaks of HTI's intent in hiring Conway MacKenzie in terms of the possibility, not the certainty, of liquidation. (First Am. Compl. ¶ 25.) Furthermore, the complaint alleges that, pursuant to the forbearance agreements, Chase directed HTI to either find a buyer for all its assets or to refinance with another lender. Had either of these options proven successful, liquidation would not have been necessary and HTI, or its successor, would have been capable of paying Plaintiff for the goods. These facts are simply not sufficient to support a plausible claim that

HTI had no intention of paying for the goods.

Finally, Plaintiff contends that Defendants committed fraud by omitting or concealing material facts needed to qualify HTI's representations. Assuming that such a claim is properly before the court,[7] Plaintiff's pleadings are insufficient to establish fraudulent concealment. A claim alleging concealment of material facts "requires a duty to disclose on the part of the defendant." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397 (7th Cir. 2009). "Where . . . there is no fiduciary relationship between the parties, a duty to disclose may arise under Illinois law if the defendant makes an affirmative statement that it passes off as the whole truth while omitting material facts that render the statement a misleading 'half-truth.'" *Id.* (citations omitted).[8] Plaintiff attempts to characterize HTI's explanations for certain of its actions as misleading without a "full and fair disclosure of the true facts surrounding HTI's workout": the "extraordinary container volume" explanation for the shipment hold; HTI's request to expedite shipment of certain goods

---

[7]     Under Illinois law, fraudulent misrepresentation and fraudulent concealment are "two separate and distinct forms of common law fraud," which require plaintiffs to plead different elements. *Trs. of AFTRA Health Fund v. Biondi*, 303 F.3d 765, 776-77 (7th Cir. 2002) ("In order for a plaintiff to demonstrate fraudulent concealment under Illinois law, it must prove: (1) the concealment of a material fact; (2) that the concealment was intended to induce a false belief, under circumstances creating a duty to speak; (3) that the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) that the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury."). Defendants HTI and Wrenn contend that Plaintiff did not allege a claim of fraudulent concealment in its complaint, and that Plaintiff's attempt to amend its pleading through its brief is improper. *See Thomas v. Nachtrieb*, 888 F.2d 1202, 1205 (7th Cir. 1989) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss . . . ."). Indeed, the Plaintiff's complaint speaks only of misrepresentations, not omissions. The Seventh Circuit, however, has "stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery." *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (2011).

[8]     Plaintiff contends that as a corporation within the zone of insolvency, HTI owed RMB a fiduciary duty that gave rise to an obligation for complete disclosure of HTI's financial situation. As explained below, however, HTI did not owe Plaintiff, as an individual creditor, such a fiduciary duty.

20

after canceling the hold because of an "urgent need"; or HTI's notice that it was refinancing with a different lender. (Pl.'s Omnibus Mem. in Opp. to Defs.' Mots. To Dismiss at 17-18.) Plaintiff does not explain, however, how these statements were misleading. HTI did not hold out these unsolicited representations as the whole truth of HTI's financial situation, nor would a sophisticated party such as Plaintiff interpret them as unvarnished disclosure. Moreover, as explained above, HTI made other representations that gave Plaintiff notice of HTI's financial difficulties—for example, by way of Wrenn's Vendor Letter, which informed suppliers that HTI's sales had been disappointing and requested extended payments because HTI was experiencing short-term borrowing restrictions.

For the reasons above, Plaintiff's claim for a scheme to defraud is dismissed as against all Defendants.[9]

### C.    Civil Conspiracy (Count III) and Unjust Enrichment (Count V)

Plaintiff's claims for civil conspiracy and unjust enrichment are contingent on Plaintiff's fraud claim. Under Illinois law, a plaintiff alleging a civil conspiracy must establish: "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to plaintiff." *Borsellino,* 477 F.3d at 509 (citing *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 133, 720 N.E.2d 242, 258 (1999)). Because the court has concluded that Plaintiff has failed to adequately plead the underlying fraud, Plaintiff has likewise failed to plead its conspiracy claim, which relies on Plaintiff's fraud claim to prove the requisite tortious act.

Similarly, "[u]nder Illinois law, unjust enrichment is not a separate cause of action. 'Rather,

---

[9]    In addition to failing to adequately plead fraud with the required particularity, Plaintiff's fraud claim against Defendants Chase and Capital Partners fails because Plaintiff does not allege that these Defendants made any representations to Plaintiff at all, and neither stand in a fiduciary relationship with Plaintiff.

it is a condition that may be brought by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct.'" *Pirelli*, 631 F.3d at 447 (quoting *Alliance Acceptance Co. v. Yale Ins. Agency, Inc.*, 271 Ill. App. 3d 483, 492, 648 N.E.2d 971, 977 (1st Dist. 1995)). As the Seventh Circuit has held, "when the plaintiff's particular theory of unjust enrichment is based on alleged fraudulent dealings, and [the court] reject[s] the plaintiff's claims that those dealings, indeed, *were* fraudulent, the theory of unjust enrichment that the plaintiff has pursued is no longer viable." *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007).[10] The unjust enrichment count in Plaintiff's complaint references "tortious, illegal acts," rather than Plaintiff's breach of contract claim. (First Am. Compl. ¶ 170.) Because Plaintiff's particular theory of unjust enrichment is based on the alleged scheme to defraud and civil conspiracy claims, the unjust enrichment claim fails along with those claims.

## V.    Conversion (Count IV)

To prove a claim for conversion under Illinois law, "a plaintiff must show: (1) a right to the property; (2) an absolute and unconditional right to the immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Van Diest Supply Co. v. Shelby Cnty. State Bank*, 425 F.3d 437, 439 (7th Cir. 2005) (citing *Cirrincione v. Johnson*, 184 Ill. 2d 109, 114, 703 N.E.2d 67, 70 (1998)). Where, however, a plaintiff delivers goods to a defendant voluntarily and

---

[10]    There appears to be some confusion over when unjust enrichment can be pleaded as a stand-alone cause of action. *See id.* at 854 n.7, 855 (acknowledging that "the wrongful conduct predicate to unjust enrichment is not an absolute requirement in Illinois" and noting that the Illinois Supreme Court outlined "various theories that could support an unjust enrichment claim" in *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989)). The court reads *Pirelli* and *Association Benefit Services* to hold that when a plaintiff relies on a wrongful conduct theory of unjust enrichment, a court must dismiss the unjust enrichment claim if it dismisses the underlying wrongful conduct claims, regardless of whether unjust enrichment may be a stand-alone cause of action under other theories.

in the normal course of business, a claim for conversion is properly dismissed. *See Hayden Stone, Inc. v. Brode*, 508 F.2d 895, 897 (7th Cir. 1974); *see also In re McCook Metals, L.L.C.*, 319 B.R. 570, 594 (Bankr. N.D. Ill. 2005) ("While an authorized transfer may be fraudulent or involve a breach of fiduciary duty, it cannot be the basis for a claim of conversion."). Here, Plaintiff has already recovered a portion of the ten-day goods it claims, pursuant to the Agreed Order, and may be entitled to reclaim more; but Plaintiff does not possess an absolute and unconditional right to immediate possession of any of the remaining property that it voluntarily shipped to HTI.

## VI.     Breach of Fiduciary Duty (Count VIII)

The court need not consider the merits of Plaintiff's remaining claim—that HTI and Wrenn breached the special-circumstance fiduciary duty owed to creditors of an insolvent company—because Plaintiff, as an individual creditor, lacks standing to bring such a claim. As a preliminary matter, the parties dispute whether Illinois or Delaware law applies. Defendants HTI and Wrenn contend that under Illinois choice-of-law rules, the law of the state of incorporation—in this case, Delaware—governs claims for breaches of fiduciary duties. *See Prime Leasing, Inc. v. Kendig*, 332 Ill. App. 3d 300, 314 n.1, 773 N.E.2d 84, 96 n.1 (1st Dist. 2002) (concluding, in a lawsuit brought by creditors against an insolvent company, that "[p]ursuant to Illinois choice-of-law principles, the fiduciary duty claims are governed by the law of the state of incorporation"). Plaintiff notes, however, that the case *Prime Leasing* cited for support, *Libco Corp. v. Roland*, 99 Ill. App. 3d 1140, 426 N.E.2d 309 (4th Dist. 1981), concerned the choice-of-law rules governing internal matters of the corporation. Plaintiff contends that this rule does not apply to external matters, such as a suit brought by a creditor against a debtor, and that Illinois law applies under the more general "most significant contacts test." *See Westchester Fire Ins. Co. v. G. Heileman Brewing Co.*, 321 Ill. App. 3d 622, 628, 747 N.E.2d 955, 961 (1st Dist. 2001). Although Defendants have the more persuasive argument, the court need not decide this issue either because, as discussed below, the court finds that Delaware and Illinois law do not differ on the issue of creditor standing to bring a

suit for breach of the special-circumstance fiduciary duty.

Generally, "the officers and directors of a corporation do not owe fiduciary duties to creditors of the corporation. But in special circumstances, such as insolvency, directors do owe a duty to creditors." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 384 (7th Cir. 2008) (citation omitted) (applying Illinois law); *accord Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784 (Del. Ch. 1992). The parties dispute whether the corporation and its officers and directors owe this special-circumstance fiduciary duty to the creditors as a whole, or to each individual creditor. Under Delaware law, this duty "runs to all creditors as a group, not to any individual creditor." *Prime Leasing*, 332 Ill. App. 3d at 314, 773 N.E.2d at 97 (applying Delaware law). Consequently, "individual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors," though they retain the same rights as shareholders of a solvent corporation to bring derivative actions for such breaches. *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007) (emphasis omitted). Thus, Plaintiff lacks standing under Delaware law to bring this direct claim against Defendants HTI and Wrenn.

The Illinois Supreme Court has yet to address "whether a corporation's creditor may bring a direct claim for breach of special circumstance fiduciary duty." *Judson Atkinson Candies*, 529 F.3d at 384.[11] In such circumstances, a federal court must attempt to predict how the state's highest court would decide the issue presented. *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir. 2001). Addressing this issue, the Bankruptcy Court for the Northern District of Illinois recently concluded that the Illinois Supreme Court was likely to agree with the Delaware

---

[11] In *Judson Atkins Candies*, the Seventh Circuit noted conflicting decisions by Illinois appellate courts on whether creditors could bring such suits. *Id.* The Seventh Circuit did not predict how the Illinois Supreme Court would rule, instead concluding that even if the creditor in that case had standing to sue, the creditor had not adequately pleaded a claim for breach of fiduciary duty. *Id.*

Supreme Court's holding in *Gheewalla* that "an individual creditor may not directly sue a director of an insolvent corporation for breach of fiduciary duty." *In re Netzel*, 442 B.R. 896, 901 (Bankr. N.D. Ill. 2011). The *Netzel* court noted that several courts allowed individual creditors to maintain such actions without discussing the standing issue. *Id.* at 899-900 (citing *Technic Eng'g, Ltd. v. Basic Envirotech, Inc.*, 53 F. Supp. 2d 1007, 1010-11 (N.D. Ill. 1999); *Paul H. Schwendener, Inc. v. Jupiter Elec. Co.*, 358 Ill. App. 3d 65, 74-75, 829 N.E.2d 818, 828 (1st Dist. 2005); *O'Connell v. Pharmaco, Inc.*, 143 Ill. App. 3d 1061, 1070-71, 493 N.E.2d 1175, 1181-82 (4th Dist. 1986)). At least one Illinois Appellate Court has addressed the issue, albeit under Delaware law prior to *Gheewalla*. In that case, the court concluded that creditors lack standing to bring direct suits. *Prime Leasing*, 332 Ill. App. 3d at 314-15, 773 N.E.2d at 96-97. The *Netzel* court concluded that such a holding was consistent with prior Illinois Supreme Court decisions that assets of an insolvent company, including any judgment for the benefit of all creditors against directors who breach their fiduciary duty, are held in trust for payment to all creditors pro rata and without preference. *Id.* at 900-01 (citing *Atwater v. Am. Exch. Nat'l Bank of Chicago*, 152 Ill. 605, 611, 38 N.E. 1017, 1020-22 (1893); *Roseboom v. Warner*, 132 Ill. 81, 88, 23 N.E. 339, 341 (1890); *Beach v. Miller*, 130 Ill. 162, 172, 22 N.E. 464, 466 (1889)). Additionally, because Illinois courts are often guided by decisions of other jurisdictions, especially Delaware cases on corporate law issues, the *Netzel* court predicted that Illinois courts were likely to adopt the holding in *Gheewalla*. *Id.* at 901 (citing *Treco, Inc. v. Land of Lincoln Sav. & Loan*, 749 F.2d 374, 379 (7th Cir. 1984); *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 509 n.29 (N.D. Ill. 1988)). This court finds the *Netzel* court's analysis persuasive, and therefore concludes that under Illinois law, as under Delaware law, Plaintiff lacks standing to bring a direct suit for breach of the special-circumstance fiduciary duty.

## CONCLUSION

For the reasons state above, this court grants in part and denies in part Defendants' motions to dismiss [41], [44], [47], [60], [73], [76], [77], [79], [81]. Plaintiff's claims survive for breach of

25

contract (Count VI), account stated (Count VII), and reclamation (Count I) for the ten-day goods as against Defendants HTI and Cavanaugh. All other claims are dismissed as against all Defendants.

ENTER:

Dated: February 7, 2012

_____
REBECCA R. PALLMEYER
United States District Judge